IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**NICK L. BLEA,**

      **Plaintiff,**

vs.                                                  **No. CIV 04-1149 LCS**

**JOANNE B. BARNHART,**
**Commissioner of Social Security,**

      **Defendant**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion to Reverse and Remand Administrative Agency Decision (Doc. 7), filed February 2, 2005. The Commissioner of Social Security issued a final decision denying Plaintiff's application for disability insurance benefits on September 2, 2004. This matter comes before the Court pursuant to 28 U.S.C. § 636(c). The United States Magistrate Judge, having considered the Motion, briefs, administrative record, and applicable law, finds that this Motion is not well-taken and should be **DENIED**.

    **I.**       **STANDARD OF REVIEW**

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied the correct legal standards. *Hamilton v. Sec'y of Health and Human Svcs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such relevant evidence as a reasonable mind might accept to support the conclusion. *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988). The decision of an Administrative Law Judge ("ALJ") is not supported by substantial evidence if the evidence supporting the decision is

overwhelmed by other evidence on the record.  *Id.* at 805.

In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of at least twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)). The Secretary has established a five-step process for evaluating a disability claim.  *Bowen v. Yuckert*, 482 U.S. 137 (1987).  At the first four levels of the sequential evaluation process, the claimant must show that he is not engaged in substantial gainful employment, that has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpart P, App. 1, or he is unable to perform work he had done in the past.  20 C.F.R. §§ 404.1520 and 416.920.  *See Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir. 1988).  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education and prior work experience.  *See Gatson v. Bowen*, 838 F.2d 442, 448 (10th Cir. 1988).

## II.  PROCEDURAL HISTORY

Plaintiff, now 43 years old, filed his applications for disability insurance benefits under Title II of the Social Security Act and for supplemental security income under Title XVI of the Act on March 19, 2002, (R. at 55, 290), alleging disability commencing on June 3, 1997.  Plaintiff has an eleventh grade education and listed past relevant work as a construction worker.  (R. at 73, 80).

Mr. Blea's application for disability insurance benefits was denied at the initial level on June 19, 2002 and at the reconsideration level on October 8, 2002. (R. at 35, 42). Following the denial of his application for disability insurance benefits, Plaintiff's attorney filed a Request for Hearing before Administrative Law Judge. (R. at 46). This hearing took place on September 10, 2003. (R. at 310).

Mr. Blea's request for supplemental security income, although initially denied, was granted at the reconsideration level on October 2, 2002. (R. at 18). This request was granted because, at the time the application was filed on March 19, 2002, it was determined that the claimant's post-traumatic arthritis and dysthymia were disabling, medically determinable impairments. (Id.) As such, Plaintiff's claim for supplemental security income has been dismissed and is not an issue before this Court.

The ALJ issued his decision regarding Plaintiff's application for disability insurance benefits on November 17, 2003 (R. at 18-26), analyzing Plaintiff's claim in accordance with the sequential evaluation set forth in 20 C.F.R. § 404.1520(a)-(f). Before proceeding with the evaluation however, the ALJ noted that Mr. Blea was insured for a period of disability insurance benefits pursuant to Section 216(i) of the Social Security Act through December, 1998. (R. at 25).

At step one of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. (Id.) At the second and third steps, the ALJ determined that, while Mr. Blea had a severe impairment of post-traumatic arthritis in the right foot, this impairment, as of December, 1998, was not of the severity required to meet an impairment found in the Listing of Impairments ("Listings"), Appendix I, Subpart P, 20 C.F.R.

§§ 401.1501-1599.  (R. at 21).  The ALJ determined at step four that, as of December 1998, Plaintiff retained the Residual Functional Capacity ("RFC") to perform a range of simple, repetitive work in which standing, walking and lifting were restricted.  (R. at 23).  The ALJ further determined that, in December of 1998, Mr. Blea had been unable to perform his past relevant work as a construction worker.  (Id.)  At step five, the ALJ consulted a vocational expert who opined that Plaintiff, despite his limitations, would have been capable of performing jobs existing in significant numbers in the national economy and that, therefore, he had not been under a disability, as defined in the Social Security Act, at any time prior to his date last insured.  (R. at 26).

Plaintiff filed a Request for Review of Hearing Decision on January 15, 2004 (R. at 13) and the Appeals Council denied this request on September 2, 2004.  (R. at 6-9).  Hence, the decision of the ALJ became the final decision of the Commissioner for purposes of judicial review.  On October 13, 2004, Plaintiff filed the present action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

### III.    FINDINGS

The medical records before the ALJ date from May, 1995, at which time Plaintiff underwent an MRI of the lumbar spine, apparently due to a lifting injury.  (R. at 195).  The examination demonstrated disc degeneration at multiple levels, with the most significant finding being a disc herniation and extrusion of disc material into the right L5-S1 lateral recess with accompanying compression of the L5 nerve root.  (Id.)

The incident which forms the main basis for Plaintiff's alleged disability occurred in May of 1997, at which time Mr. Blea sustained a large caliber gunshot wound to his right foot.  (R. at

141).  Dr. William Ritchie performed surgery on Plaintiff's foot on June 2, 1997, noting large soft tissue and bone defect in the mid-foot.  (Id.)  All tissues appeared viable.  (Id.)  X-rays revealed a shattered mid-foot with "fragments too numerous to count and appearing considerably displaced."  (R. at 146).

Mr. Blea underwent a second procedure for irrigation and debridement of the wound on June 4, 1997.  (R. at 136).  Active motion of the toes was not apparent at that time, possibly secondary to pain.  (R. at 139).  Plaintiff was informed that multiple debridements would be necessary with possible later reconstruction or amputation.  (R. at 140).  Dr. Neil Chen recommended eventual bone grafting to restore stability to the foot once the wound cavity was adequately sterilized.  (R. at 135).

A third procedure for irrigation and debridement was performed on June 9, 1997.  (R. at 132).  An arteriogram read by Dr. Cronk on the same day revealed disruption of the dorsal pedis artery.  The posterior tibial artery was seen to provide blood to all toes through the arch, although a small amount of reflux from the lateral aspect of the foot was noted, as was extensive bony deformity.  (R. at 131).

Mr. Blea underwent a fourth surgery on June 14, 1997, at which time the wound was again debrided, a portion of the rectus abdominis muscle was transferred to the foot, and a skin graft was applied to the foot.  (R. at 127).  Plaintiff was discharged from the hospital on June 21, 1997. Dr. Neil Chen noted his post-operative course to be unremarkable.  (R. at 117).  Plaintiff was instructed to follow up with Dr. Chen and Dr. Ritchie at one week and two weeks post-discharge.  (Id.)

Plaintiff visited Dr. Chen in early July 1997, at which time Dr. Chen opined that Mr.

Blea's next operation should be performed in approximately three months to allow the muscle flap to reduce in size and to pick up secondary blood supplies from the surrounding tissues. (R. at 149). In mid-July, 1997, Dr. Ritchie observed a large amount of bone loss through the midfoot, though did not observe signs of ongoing bone destruction. (R. at 169). It was noted that Mr. Blea would need an extensive bone graft of the midfoot although Dr. Ritchie did not believe further lengthening of the Achilles tendon would be required. (Id.)

Dr. Ritchie performed an illiac crest bone graft to the Plaintiff's right foot wound in early August, 1997. (R. at 167). A week following the procedure the wound appeared to be healing well and no signs of infection were noted. (Id.) Plaintiff did develop an infection two weeks following the bone graft. (R. at 166). This infection was treated and by the end of August, 1997, swelling and pain were noted to have greatly improved. (R. at 165). In September of 1997, Mr. Blea continued to improve and was counseled to progress to 25 lbs. weight bearing.

Five months following the gunshot wound, Mr. Blea was noted to be ambulatory, sometimes wearing high-top tennis shoes and sometimes using a fracture walker. (R. at 162). At that time Plaintiff's wounds were noted to be healed with minimal swelling of the wound site. (Id.) Neurovascular status was unchanged, with sensation to the dorsum of the toes and numbness distal to the wound. Dr. Ritchie instructed Plaintiff to gradually wean himself from the walker and to use special shoe supports if necessary. (Id.)

Seven months following injury, Dr. Ritchie found that Plaintiff was able to ambulate with minimal restrictions. X-rays obtained at this time revealed consolidation of the bone graft, although the studies were unclear as to whether complete healing had occurred. (R. at 161). No signs of a destructive bony process were observed and it was felt the pain Plaintiff continued to

experience was likely due to bony deformities or incomplete fusion of the bone graft.  (Id.)  Plaintiff was also given a handicap parking placard.  (Id.)

In February and March of 1998, Mr. Blea continued to follow up with Dr. Ritchie and Dr. Laura Mitchell for continued evaluation of foot pain.  (R. at 156-161).  Dr. Ritchie observed that Plaintiff's foot deformity and neurovascular status was unchanged, further noting that no skin breakdown was seen.  (R. at 159).  Dr. Ritchie instructed Plaintiff to continue using his orthotic device and to use a cane when necessary.  (Id.)  He was also sent to Dr. Mitchell for further evaluation of possible future foot and ankle surgery.  (Id.)

Dr. Mitchell noted that Plaintiff was not currently working and had been taking Darvocet and Ibuprofen for pain.  (R. at 156).  She also noted Mr. Blea was not interested in any further foot surgery.  (Id.)  Surgical remodeling of the bone was not recommended and Mr. Blea was advised to continue with his anti-inflammatory medications as needed.  (R. at 157).  Plaintiff continued to have pain until at least June of 1998, at which time he was provided with another orthotic device and was given Lortab for pain.  (R. at 154).

The record is silent as to Plaintiff's condition until early 2000, at which time Plaintiff again saw Dr. Ritchie and Dr. Mitchell.  (R. at 150-153).  At that time, Mr. Blea indicated that pain was gradually increasing in the foot and he had begun to have difficulties with walking.  (R. at 153).  X-rays revealed some degenerative changes at the first tarsal metatarsal joint.  (Id.)  It was felt Plaintiff might benefit from a new orthotic device.  (Id.)  Dr. Mitchell noted Plaintiff had significant post-traumatic arthritis which resulted in difficulty walking.  (R. at 150).  During his visit with Dr. Mitchell, Plaintiff expressed some interest in undergoing a Syme's amputation.  (R. at 151).

Plaintiff underwent an electrocardiogram in November of 2001 which revealed the presence of sinus bradycardia. (R. at 208). Mr. Blea also underwent surgery in December of 2001 for repair of a right inguinal hernia, and was noted to have tolerated the procedure well. (R. at 205-206).

Mr. Blea again sought treatment for pain in his right foot in February of 2002. (R. at 197-198). Dr. Robert Schenk noted significant arthritic changes and stiffness. (Id.) Plaintiff was noted to have difficulty ambulating and further indicated that he experienced esophageal pain due to frequent use of Ibuprofen and other anti-inflammatory drugs. (Id.) Dr. Schenck advised Plaintiff on switching to a COX-2 inhibitor for pain and recommended using Celebrex as well. (Id.) Dr. Schenck opined that Plaintiff was, in his opinion, permanently fully disabled and unemployable. (R. at 198).

A physical residual functional capacity assessment was completed on June 12, 2002 by Dr. Eileen Brady. (R. at 220-227). Dr. Brady found that Plaintiff could frequently lift 10 pounds and occasionally lift 20 pounds. (R. at 221). She further found Mr. Blea would be capable of standing and/or walking up to 2 hours in an 8-hour work day. (Id.) Dr. Brady disagreed with Dr. Schenck's opinion that Plaintiff was permanently disabled because she felt he was able to ambulate occasionally and was unlimited in the ability to sit or to use his hands. (R. at 226).

Mr. Blea underwent a psychiatric evaluation in August of 2000, performed by Dr. Eligio Padilla. (R. at 242-252). Dr. Padilla opined that Mr. Blea was suffering from dysthymic disorder and discussed the possibility of major depressive disorder. (R. at 246). Dr. Padilla also noted

alcohol dependence in early remission. (Id.) Plaintiff's GAF score was noted to be 35[1] and the prognosis was felt to be guarded to poor, depending on whether the Plaintiff could obtain adequate psychiatric care. (Id.) Dr. Padilla expressed concerns about suicidal behavior. (Id.)

Dr. Padilla also found Mr. Blea to be markedly limited in the ability to understand detailed or complex instructions, in his ability to carry out instructions and to concentrate, in his ability to interact socially, and to be moderately limited in his adaptive abilities and in his ability to react appropriately to normal hazards in the workplace. (R. at 247). Dr. Padilla noted that Mr. Blea's ability to function in a work environment would be detrimentally affected in the event Mr. Blea resumed drinking. (R. at 248). Plaintiff's IQ was found to be in the low-average range. (R. at 249).

A second psychiatric examination was performed in September of 2002. (R. at 228-241). Although the report apparently suggests that no psychiatric limitations were established, the basis for this finding is unknown as the record provided to the Court is illegible. (R. at 239). Mr. Blea underwent a third psychiatric evaluation in October of 2002, performed by Dr. Scott Walker. (R. at 267-280). Plaintiff was found to have depressive syndrome characterized by appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, and thoughts of suicide. (R. at 270). The most closely applicable listing was felt to be Listing 12.04-Affective Disorders. (R. at 275). Mr. Blea was felt to have moderate difficulties in maintaining concentration and social functioning. (R. at 277).

---

[1]The GAF scale is used to assess an individual's overall level of functioning. This information is useful in planning treatment, measuring its impact and in predicting outcome. The GAF scale is divided into 10 ranges of functioning. A GAF of 35 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) [DSM-IV].

Other psychiatric evaluations performed in August of 2002 by Dr. William K. Summers revealed slight to moderate difficulties in understanding and memory, marked limitations in the ability to concentrate and sustain tasks, as well as marked limitations in the ability to interact socially and to adapt to changes in the workplace.  (R. at 288-289).

In a pain report completed in May of 2002, Mr. Blea indicated that the pain in his foot was constant and that walking increased the severity of the pain.  (R. at 89).  Although Mr. Blea was taking Celebrex and Ibuprofen, he indicated that these medications rarely helped his pain and that they caused gastric upset. (R. at 91).  Plaintiff stated he could perform minimal chores around the house, but that he needed a cane if he had to walk for a distance greater than 15 feet.  (R. at 96).  Social contacts were also noted to be very limited.  (R. at 99).

## IV.  ANALYSIS

Plaintiff raises the following allegations of error in his Motion to Reverse or Remand Administrative Agency Decision:

1. The ALJ failed to apply Social Security Ruling 83-20 when Claimant suffered a Traumatic Impairment preventing him from working prior to December, 1998.

2. The ALJ failed to address the evidence of lay witnesses as required by the Tenth Circuit and SSR 83-20 and 85-16.

3. The ALJ posed defective hypothetical questions to the Vocational Expert.

**a.   Failure to Correctly Apply SSR 83-20**

The sole question before this Court deals with Plaintiff's claim that he was disabled and thus entitled to disability insurance benefits prior to December of 1998, the date he was last insured.  Plaintiff's application for supplemental security income, filed in 2002, has already been

granted and is not before the Court.

Plaintiff's first allegation of error is that the ALJ failed to properly consider Social Security Ruling ("SSR") 83-20 which, he contends, would have directed the ALJ to a finding that Plaintiff was disabled prior to December 31, 1998. (Doc. 8). SSR 83-20 sets forth instructions for determining the onset date of a disability. Plaintiff points to the section of SSR 83-20 entitled, "Onset in Disabilities of Traumatic Origin" as support for his contention that he became disabled on or around June 2, 1997, the approximate date of his injury. This section states:

> For disabilities of traumatic origin, onset is the day of the injury if the individual is thereafter expected to die as a result or is expected to be unable to engage in substantial gainful activity (SGA) (or gainful activity) for a continuous period of at least 12 months.

It is by no means clear from the record that, as of June 2, 1997, Mr. Blea was expected to be unable to engage in substantial gainful activity for a continuous period of at least 12 months. Moreover, it is not clear that Plaintiff was expected to be unable to engage in substantial gainful activity for at least twelve months at any time during the period under review. It is therefore necessary to examine another section of SSR 83-20 entitled, "Precise Evidence not Available- Need for Inferences." This section indicates that in some cases, to determine the length of time an impairment has existed at a disabling level of severity, it will be necessary to rely on an informed judgment of the facts in the particular case.

In the present case, the medical records by from 1997 and 1998 by no means necessitate an inference that Mr. Blea's impairment existed at a disabling level of severity. The records in fact indicated that Mr. Blea had begun ambulating with the assistance of orthotic devices and that, while he continued to have pain, he informed Dr. Mitchell that he did not desire further surgery.

(R. at 156). The last records available in 1998 indicated that Mr. Blea's condition was progressing well. The record is then silent until 2000, well after Plaintiff's period of insurance ended, at which time it appeared Mr. Blea's condition was becoming more severe. SSR 83-20 further states,

> How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis.

In making his determination, the ALJ made an informed judgment based on Plaintiff's medical records. Plaintiff argues however that the SSR 83-20 requires the ALJ to consult a medical advisor when date of onset must be inferred. (Doc. 8). I find that the failure to consult a medical advisor at the hearing was not error. The medical records from the period in question all indicate that Mr. Blea's impairment did not exist at a disabling level of severity. The ALJ's determination therefore had a legitimate medical basis, as is required by SSR 83-20, and the Commissioner's decision was supported by substantial evidence.

Plaintiff's counsel further argues that the ALJ should have consulted a psychiatric expert in determining the date of disability onset. However, there is nothing in the record to indicate that, prior to December 31, 1998, Plaintiff had any type of disabling psychiatric impairment. The ALJ thus acted within the scope of his authority in inferring that any psychiatric impairments were not disabling prior to December 31, 1998, in accordance with SSR 83-20.

### b.     Failure to Correctly Apply SSR 83-20 and 85-16 for Lay Witness Testimony

Plaintiff next argues that the ALJ erred in failing to address or give proper weight to the testimony of Mr. Blea's wife at the hearing. Rebecca Blea testified that, beginning on the day Mr.

Blea sustained his gunshot wound, he had expressed suicidal thoughts.  (R. at 332-333).  She further stated that Mr. Blea's suicidal ideation had continued to the present time and that Mr. Blea expressed such thoughts 2-3 times per week.  (R. at 333).  Mrs. Blea also indicated that Plaintiff had experienced marked physical restrictions since June of 1997.  (R. at 333-334).

The ALJ did not specifically cite to Mrs. Blea's testimony regarding Plaintiff's mental state in rendering his opinion.  (R. at 18-26).  However, contrary to Plaintiff's assertion, it is not apparent that this failure constitutes error necessitating remand.  20 C.F.R. § 404.1513(a) states that to establish an impairment, a Plaintiff must provide, "evidence from acceptable medical sources."  20 C.F.R. § 404.1513(d) goes on to state:

> In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we *may* also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work.  Other sources include, but are not limited to-
>
> . . . .
>
> (d) Other non-medical sources (for example, spouses, parents and other caregivers . . .) (emphasis added).

The plain meaning of the regulation does not indicate that remand is required when an ALJ does not discuss lay witness testimony, nor has Plaintiff provided the Court with controlling authority suggesting that the regulation should be interpreted in this manner.

Furthermore, it is well-established in the Tenth Circuit that the ALJ is not required to discuss every piece of evidence.  *Clifton v. Chater*, 79 F.3d 1007, 1009-1010 (10th Cir. 1996).  Nevertheless, Plaintiff is correct to point out that the record must demonstrate that the ALJ considered all of the evidence and must also demonstrate that the ALJ has discussed the

13

uncontroverted evidence he chooses not to rely upon as well as significantly probative evidence he rejects. *Id.* at 1010 (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984)("a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position")).

Plaintiff argues that the ALJ erred in failing to consider the testimony of Mrs. Blea. However, while the ALJ did not specifically refer to Mrs. Blea's testimony, it is apparent from a reading of the entire record that he did refer to the evidence provided in Mrs. Blea's testimony that Plaintiff had suffered from depression prior to December 31, 1998. The ALJ noted that:

> Mr. Blea alleged severe depression as contributory to his disability. However, a review of the record failed to provide any documentation of alleged depression or treatment for depression before . . . August 28, 2002. Mr. Blea reported long-standing depression in that examination interview, but the record did not support the claimant's subjective report. (R. at 21).

While he did not specifically refer to Mrs. Blea, it is apparent that the ALJ considered the evidence, proferred by Mrs. Blea at the hearing, that Plaintiff had suffered from depression for a number of years. The ALJ considered this evidence but rejected it because there was no corroborating documentation of depression in the medical sources prior to 2002. (Id.)

Plaintiff also contends that the ALJ violated SSR 83-20 by failing to consider Mrs. Blea's testimony. This argument must be rejected. SSR 83-20 states that if relevant medical evidence is not available:

> [I[t *may* be necessary to explore other sources of documentation. Information *may* be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition. (emphasis added).

14

As stated above, it is not apparent that the ALJ failed to consider the information which Mrs. Blea provided. Further, the plain meaning of SSR 83-20 indicates that the decision to obtain information from lay witnesses to determine date of onset is within the discretion of the ALJ. As Plaintiff has not provided the Court with controlling authority to contradict this interpretation, I find that the ALJ's decision was supported by substantial evidence and should be upheld.

           **c.**      **Defective Hypothetical Questions to Vocational Expert**

Finally, Plaintiff contends that the ALJ erred in questioning the VE because his questions failed to include all of Plaintiff's limitations as shown in the record, specifically failing to include a discussion of Plaintiff's mental impairments. The ALJ's questions to the vocational expert accounted for an individual who was limited to simple, repetitive and largely sedentary work. (R. at 338-340). Plaintiff's attorney then questioned the VE as to whether jobs existed for an individual who had marked limitations in understanding, ability to carry out instructions, to concentrate and to interact with coworkers. (R. at 341). The VE indicated that such an individual would be unable to perform the jobs listed. (Id.)

Plaintiff argues that, given this response, the ALJ erred in finding Plaintiff could perform jobs existing in the national economy as of December 31, 1998. However, the hypothetical posed by Plaintiff's attorney set forth limitations which the ALJ found did not apply to Plaintiff. Plaintiff's psychiatrist found marked mental limitations as of 2002, but specifically stated he was unable to speculate about Plaintiff's mental condition prior to that time. (R. at 289). No physician prior to 2002 indicated any mental impairment, nor did Plaintiff seek any treatment prior to that time. A vocational expert's testimony is not binding on an ALJ if it incorporates limitations that the ALJ finds do not apply to the claimant. *Talley v. Sullivan*, 908 F.2d 585, 588

15

(10th Cir. 1999). As such, the ALJ was correct not to incorporate the VE's response to this hypothetical into his decision and Plaintiff's argument on this point must be rejected.

## V.     CONCLUSION

Upon review of the evidence presented in Plaintiff's Motion to Reverse and Remand Administrative Decision, I have determined that the Commissioner's decision was supported by substantial evidence. Accordingly, Plaintiff's Motion to Reverse and Remand for Rehearing is **DENIED.**

**A JUDGMENT CONSISTENT WITH THIS OPINION SHALL ISSUE.**

_____
**LESLIE C. SMITH
UNITED STATES MAGISTRATE JUDGE**